IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

BETTY J. ENNIS,                           )
                                          )
            Plaintiff,                    )
                                          )
                                          )     CIV-11-626-M
v.                                        )
                                          )
MICHAEL J. ASTRUE,                        )
  Commissioner of Social Security         )
  Administration,                         )
                                          )
            Defendant.                    )

## REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of

Defendant Commissioner denying her application for disability insurance benefits under Title

II of the Social Security Act, 42 U.S.C. §§ 416(i), 423.   Defendant has answered the

Complaint and filed the administrative record (hereinafter TR___), and the parties have

briefed the issues.   The matter has been referred to the undersigned Magistrate Judge for

initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B).   For the following reasons, it

is recommended that the Commissioner's decision be reversed and remanded for further

administrative proceedings.

1

I. Background

In her application for benefits filed September 4, 2002, Plaintiff alleged that she became disabled on March 9, 2002, due to heart, anxiety, nerve, and stomach impairments. (TR 84-86).  At the time she filed her application, Plaintiff was 45 years old and lived in Jacksonville, Florida. (TR 84, 86). She stated she did not work in 1999 or 2001, and that she stopped working on March 9, 2002. (TR 86, 102).  Plaintiff has a high school education, and she described previous work as a housekeeper, order picker, clothes presser, and product assembler. (TR 103, 111).

The medical record reflects that Plaintiff was diagnosed with gastroesophageal reflux disease ("GERD") by Dr. Kuehn in January 2002 and prescribed medication to treat this condition. (TR 450).  Plaintiff was diagnosed in March 2002 with extensive coronary artery disease by her treating cardiologist, Dr. Phillips, after undergoing cardiac catheterization studies on August 6, 2001, and March 22, 2002. (TR 201-202, 232).  Plaintiff underwent three-vessel coronary artery bypass grafting on March 25, 2002, performed by Dr. Muehrcke. (TR 176).  She was discharged eleven days later in stable condition with medications. (TR 391-392).  Dr. Phillips examined Plaintiff in May 2002 and noted that Plaintiff was "doing well postoperatively," although she reported she was taking medications for anxiety.  (TR 224).  Dr. Phillips noted that Plaintiff's "pulmonary problems postoperatively" were "getting better on inhalers and antibiotics," and she was prescribed medication to treat hyperlipidemia. (TR 224).  In August 2002, Plaintiff's family physician, Dr. Fetchero, noted that Plaintiff appeared anxious and prescribed anti-anxiety medication for her. (TR 211-212).

Plaintiff was evaluated by a registered nurse practitioner for Dr. Torrellas, a psychiatrist, in September 2002. (TR 205).  In a mental status examination, the practitioner noted that Plaintiff's mood was depressed and anxious with restricted affect but she did not exhibit abnormal thought processes or content. (TR 204).  Plaintiff reported a history of substance abuse (alcohol and methamphetamine), problems being around people due to anxiety, lack of motivation and energy, and social isolation.  (TR 385).  She was diagnosed with major depressive disorder, recurrent, moderate, possible alcohol-induced mood disorder, alcohol dependence, and nicotine dependence.  Anti-depressant, sleeping aid, and anti-anxiety medications were prescribed. (TR 205).

Dr. Phillips noted in November 2002 that Plaintiff complained of constant chest pain described as a "crushed feeling," two episodes of "sharp" chest pain occurring with exertion, and "extreme stress" due to family issues. (TR 219).  Dr. Phillips also noted that Plaintiff was "noncompliant with her diet" because she continued to regularly drink alcohol and smoke cigarettes. (TR 219).  Plaintiff underwent an exercise stress text in November 2002 which was interpreted by Dr. Geer as showing no stress-induced ischemia although Plaintiff described "mild chest discomfort" during the test and the test showed "[p]oor exercise tolerance" and "[s]ubmaximal" result "achieving 62% of the maximum predicted heart rate." (TR 217-218).

In a follow-up examination of Plaintiff in December 2002, Dr. Phillips noted that Plaintiff reported she still had some chest discomfort but was feeling better and taking her medications. (TR 216).  Dr. Phillips also noted that the exercise thallium study showed no

ischemia with normal ejection fraction. (TR 216).  Dr. Phillips opined in January 2003 that Plaintiff's chest discomfort was non-ischemic in origin. (TR 214).

Plaintiff's primary care physician, Dr. Krenzer, opined after examining Plaintiff in December 2002 and reviewing her recent stress test results that Plaintiff had ischemic chest pain, which she reported was "brought on by even minor exertion other than mild/light housework."  (TR 236).  Dr. Krenzer described her chest pain as "stable at rest and [with] mild exertion" on her medications. (TR 236).  Dr. Krenzer also opined that at the time of his examination of Plaintiff in December 2002 Plaintiff's coronary artery disease was "Class III" in severity according to the New York Heart Association's functional classification system. (TR 236).

In January 2003, Plaintiff underwent a consultative psychological evaluation conducted by Dr. Prewett. (TR 247-250).  Plaintiff reported that she was being treated by a psychiatrist, Dr. Torrellas, and had been prescribed anti-anxiety, anti-depressant, and sleeping aid medications. (TR 248).  Plaintiff stated she stopped using alcohol three months earlier when she began taking her psychotropic medications. (TR 248).  In a mental status examination, Dr. Prewett noted that Plaintiff exhibited  depressed mood, flat affect, rational and coherent thought processes, adequate attention and concentration, intact memory, and no signs of hallucination or perceptual disturbances.  (TR 248-249).  Plaintiff related symptoms of depression and anxiety, she was "afraid to be around people," and she had no friends. (TR 249).  The diagnostic impression was generalized anxiety disorder, dysthymia, and history of alcohol abuse. (TR 249).

In November 2004, Dr. Larson stated in a letter that Plaintiff had been receiving counseling and psychotropic medications at his mental health clinic since May 2003 for management of social anxiety. (TR 291).  An agency medical consultant and clinical psychologist, Dr. Bee, opined that during the relevant time period between March 2002 and September 2002 Plaintiff exhibited moderate restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation due to her mental impairments. (TR 251-261).  In a mental RFC assessment, Dr. Bee opined that prior to the date she was last insured for benefits Plaintiff was moderately limited in her ability to work in proximity to others, moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, she was also moderately limited in her ability to travel in unfamiliar places or use public transportation, and she was moderately limited in her ability to set realistic goals or make plans independently of others. (TR 265-266).

Another agency medical consultant and clinical psychologist, Dr. Wise, opined that during the relevant time period Plaintiff exhibited only mild functional limitations due to her mental impairments. (TR 269-279).  Dr. Phillips opined in November 2004 that Plaintiff was "completely disabled at this point" due to her severe coronary artery disease. (TR 292).  Dr. Lazo conducted a consultative physical examination of Plaintiff in May 2005. (TR 295-298). Plaintiff reported to the physician that following her cardiac operation she attempted to return

to work with a "cleaning service" but quit working after 2 or 3 days because of "difficulty with fatigue and breathing, and also soreness in her chest." (TR 295). Plaintiff described continuing symptoms of chest discomfort "like a pressure in the left chest" which worsened with lying down. (TR 295). She indicated she could lift only 5 pounds and walk two blocks and that she had a stent implanted in October 2004. (TR 295). The diagnostic impression was severe coronary artery disease with residual dyspnea and chest pain on moderate exertion, depression and anxiety under inadequate control, and low back discomfort on heavy lifting with no neurological deficits. (TR 298). In a medical source opinion, Dr. Lazo opined that Plaintiff could lift less than 10 pounds, stand or walk less than 2 hours in an 8-hour workday, sit less than 6 hours in an 8-hour workday, never crouch, and occasionally climb, kneel, crawl, stoop, reach, or handle. (TR 302-304).

ALJ Meisburg entered a decision on March 8, 2006, in which the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (TR 318-340). In a remand order entered March 28, 2007, the Appeals Council reversed the ALJ's decision due to a number of errors, including a failure to follow the requirements of 20 C.F.R. §404.1520a in evaluating Plaintiff's mental impairments, and remanded Plaintiff's application for further administrative proceedings. (TR 353-355).

A supplemental hearing was conducted in December 2007 at which Plaintiff testified and  a medical expert and psychologist, Dr. Lewis, and a vocational expert ("VE") also testified. (TR 506-526). In the ALJ's supplemental decision issued April 15, 2008, the ALJ found at step one that Plaintiff had not worked during the period from her alleged disability

onset date of March 9, 2002 through the date she was last insured for Title II benefits on

September 31, 2002. (TR 23).  At step two, the ALJ found that through the date that Plaintiff

was last insured for Title II benefits she had severe impairments due to "diffuse coronary

artery disease with [coronary artery bypass grafting] in March 2002, depressive disorder,

anxiety disorder, low back pain, GERD, and status post hysterectomy." (TR 23).  At step

three, the ALJ found that Plaintiff's impairments or combination of impairments did not meet

or medically equal one of the listed impairments at 20 C.F.R. pt. 404, subpt. P, app. 1. (TR

26).  At the fourth step, the ALJ found that despite her severe impairments and mild to

moderate functional limitations, Plaintiff had the residual functional capacity ("RFC") during

the relevant time period to perform sedentary work that was simple and unskilled. (TR 27-

33).  Although Plaintiff was unable to perform her previous jobs, the ALJ found, based on

the VE's testimony at the supplemental hearing, that Plaintiff was capable of performing jobs

available in the economy, including the jobs of ticket taker, order taker, and cutter/paster.

(TR 35).  Based on these findings, the ALJ denied Plaintiff's application for benefits, and the

Appeals Council declined to review this decision. (TR 9-11).

II. Standard of Review

        Plaintiff now seeks judicial review of the final decision of the Defendant

Commissioner embodied in the ALJ's determination.  Judicial review of a decision by the

Commissioner is limited to a determination of whether the Commissioner's factual findings

are supported by substantial evidence in the record and whether the correct legal standards

were applied.  Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart,

331 F.3d 758, 760 (10th Cir. 2003).  The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009)(citations, internal quotation marks, and brackets omitted).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i).  The Commissioner follows a five-step sequential evaluation procedure to determine whether a claimant is disabled. Doyal, 331 F.3d at 760. In the first four steps of this process, the claimant has the burden of establishing a prima facie case of disability. Id.  In this case, Plaintiff's claim was denied at step five.  At the fifth and final step of the requisite sequential evaluation process, the burden shifts to the Commissioner "to show that the claimant retains sufficient [residual functional capacity] . . . to perform work in the national economy, given her age, education and work experience." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007)(internal quotation and citation omitted).

III. Step Three

Plaintiff contends that the ALJ's step three finding that her cardiac impairment did not meet or equal the requirements of Listing 4.04 is not supported by substantial evidence and that the ALJ erred in misrepresenting the evidence, ignoring significantly probative evidence,

8

and in failing to apply the technique described in Social Security Ruling 83-20 to infer an

onset date when the record is ambiguous.

In this case, the record contains the letter opinion of a medical expert, Dr. Griscom,

dated September 2, 2005, in response to interrogatories posed by the ALJ. In this opinion,

Dr. Griscom stated that Plaintiff's cardiac impairment was severe enough prior to the date

her insured status expired that she

> could meet [Listing] 4.04 (under 1b - 70% or more narrowing of
> a non-bypassed artery (i.e. her right coronary artery 80-90%
> blocked mid-proximal involving 30-40mm) if one accepts [the
> Listing's requirement that the cardiac impairment resulted in]
> marked limitation in activity [with] fatigue, angina, palpitation,
> or dyspnea [with] ordinary activity. Bypasses were to [left
> anterior descending], circumflex branch, and posterior
> descending artery. The period from surgery to [her date last
> insured] is short and a bit harder to evaluate.

(TR 306). In the letter opinion, Dr. Griscom referred to an attached letter in which he

summarized the medical record. He stated that according to the medical record Plaintiff "had

a success[ful] triple bypass 3/25/2002 . . . ." (TR 309). Dr. Griscom further opined that

although Plaintiff had "extensive involvement with coronary artery disease" there were

multiple "problems" with a determination that she was disabled on or before the date she was

last insured in September 2002. Dr. Griscom described these "problems" as including the

evidence that she was still smoking and drinking in November 2002 "affecting her lipids,"

Dr. Phillips believed her chest pain at the time he last saw her in December 2002 was non-

ischemic, or non-cardiac, in origin, she underwent a thallium exercise stress test in November

2002 that was "negative for ischemia," and Dr. Phillips did not state that she was disabled

9

until "much later" in November 2004. (TR 312).  Dr. Griscom further noted Plaintiff had an "unsuccessful work attempt" for a "cleaning service" and that "[a] less strenuous job might have been possible" during the relevant time period. (TR 313).  Finally, Dr. Griscom noted that "disability is more clear cut now than previously." (TR 313).  In a supplemental response to further interrogatories regarding the effect of Plaintiff's continued smoking upon her physical abilities following her bypass surgery, Dr. Griscom stated that "[i]t is very possible [that if she had stopped smoking] she could as [sic] improved breathing, more energy, and improved cardiac function could supervene, giving her a sedentary [residual functional capacity]." (TR 314).

At the third step of the requisite sequential evaluation procedure, the ALJ "determines whether the impairment is equivalent to one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. § 404.1520(d). Bowen v. Yuckert, 482 U.S. 137, 141 (1987).  "If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled." Id.

In Clifton v. Chater, 79 F.3d 1007 (1996), the Tenth Circuit Court of Appeals reversed the decision that a claimant was not disabled *per se* at step three because "the ALJ did not discuss the evidence or his reasons for determining that [the claimant] was not disabled at step three, or even identify the relevant Listing or Listings; he merely stated a summary conclusion that [the claimant's] impairments did not meet or equal any Listing Impairment." Id. at 1009.  The court further reasoned that under 42 U.S.C. § 405(b), "the ALJ was required

to discuss the evidence and explain why he found that [the claimant] was not disabled at step three." Id. Without any specific weighing of the evidence by the ALJ, the court stated it was not possible to assess whether relevant evidence adequately supported the ALJ's step three conclusion. Id. Thus, the ALJ "must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." Id. at 1010.

Here, the ALJ found that Plaintiff had a severe impairment as a result of "diffuse coronary artery disease with [coronary arterial bypass grafting] in March 2002." (TR 23). At step three, the ALJ found that this impairment did not meet or equal the criteria of a listed impairment. In support of the step three finding, the ALJ stated:

> In terms of the claimant's alleged cardiac problems, as indicated in the earlier decision, objective evidence of testing for a cardiac impairment nor the clinical signs of heart failure are not proven during the relevant time period. The claimant was status post heart surgery, but the results of her earlier 2001 and 2002 surgery were good. Dr. John Griscom indicated that Listing 4.04 could not be met because, even though there was extensive disease and blockage in the claimant's coronary arteries, there was not the marked limitation or fatigue also required by the Listing. The state agency consultants also indicated that the claimant's impairment did not meet or equal the criteria of a medical listing.

(TR 26).

Plaintiff's argument that the ALJ misrepresented Dr. Griscom's opinion is well taken. Dr. Griscom did not specifically opine that Plaintiff's cardiac impairment could not satisfy the requirements of Listing 4.04. Rather, Dr. Griscom opined that Plaintiff's cardiac impairment "could meet" the requirements of Listing 4.04(C)(1)(b) and (2), 20 C.F.R. pt.

404, subpt. P, app. 1, if all of the requirements of the Listing were satisfied.[1] (TR 306).  In an attached letter, Dr. Griscom reviewed Plaintiff's medical record and discussed the problematic nature of a determination that she was disabled on or before the date she was last insured for Title II benefits.  However, Dr. Griscom specifically opined only that Plaintiff's "disability is more clear cut now [in the medical evidence] than previously." (TR 313).

Defendant asserts that even assuming the ALJ mischaracterized Dr. Griscom's opinion letter Plaintiff did not submit sufficient medical evidence to show that her cardiac impairment satisfied the requirements of Listing 4.04 on or before the date she was last insured for benefits.  As Plaintiff suggests, such a *post hoc* rationalization cannot overcome a step three error.  Rather, the ALJ's step three error may be harmless only if subsequent findings by the ALJ "conclusively negate the possibility" that Plaintiff's cardiac impairment was severe enough to met or equal the relevant listing.  See Fischer-Ross v. Barnhart, 431 F.3d 729, 734 (10th Cir. 2005)(recognizing that "where an ALJ provides detailed findings . . . that confirm rejection of the listings in a manner readily reviewable" by the court, reversal of a Commissioner's decision is not required).

The ALJ found at step three that Dr. Griscom's opinion, as he characterized it, was consistent with the opinions of non-treating state agency medical consultants.  The ALJ expressly reasoned that "[t]he state agency consultants also indicated that the claimant's

---

[1]Listing 4.04 (C)(1)(b) and (2) requires angiographic evidence of "70 percent or more narrowing of another nonbypassed coronary artery" "[r]esulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living."

impairment did not meet or equal the criteria of a medical listing." (TR 26).  A medical consultant, Dr. Morford, opined in January 2003 that on or before the date Plaintiff was last insured for benefits she had the RFC to perform work involving occasionally lifting up to 20 pounds, frequently lifting up to 10 pounds, standing, walking, and/or sitting up to 6 hours in an 8-hour workday, and occasionally climbing, balancing, stooping, kneeling, crouching, or crawling. (TR 240-241).  A second medical consultant, Dr. Brigety, opined in June 2003 that on or before the date she was last insured for benefits Plaintiff had the RFC to perform the same exertional requirements of work as found by Dr. Morford but with no postural limitations. (TR 283-290).

    None of these physicians were treating physicians, and the ALJ's error in mischaracterizing Dr. Griscom's opinion is compounded by the ALJ's failure to express any consideration of the opinion of Plaintiff's treating physician, Dr. Krenzer.  In a progress note of an examination of Plaintiff conducted in December 2002,  Dr. Krenzer stated that Plaintiff's cardiac impairment was "Class III" under the New York Heart Association's functional classification system. (TR 235-236). At this classification level, the patient has "[m]arked limitation of physical activity [and is c]omfortable at rest, but less than ordinary activity causes fatigue, palpitation, or dyspnea [shortness of breath]." http://www.abouthf.org/questions_stages.htm.

    Because Dr. Griscom stated that the requirements of Listing 4.04(C)(1)(b) and (2) might be met if there was evidence in the record of the "[r]esulting" limitations required by the Listing, the finding by Dr. Krenzer that Plaintiff's cardiac impairment had caused her to

experience fatigue, palpitations, or shortness of breath with "less than ordinary activity" was significantly probative evidence that could not simply be ignored or rejected by the ALJ without sufficient explanation.

Moreover, an ALJ must follow a specific procedure in evaluating a treating physician's opinion. The ALJ "must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.  If the answer to this question is 'no,' then the inquiry at this stage is complete." Robinson v. Barnhart, 366 F.3d 1078, 1082 (10th Cir. 2004)(quotations and citation omitted).  If the answer to this question is yes, then the ALJ must "confirm that the opinion is consistent with other substantial evidence in the record." Id. (quotation omitted). If it is, then the opinion is entitled to controlling weight. Even if a treating physician's opinion is not entitled to controlling weight, the ALJ must give deference to the opinion and weigh the opinion using relevant factors, including the length, frequency, nature, and extent of the treating relationship; the extent to which the opinion is supported by relevant evidence; the extent to which the opinion is consistent with the record as a whole; the doctor's specialization, if any; and other factors. See 20 C.F.R. § 404. 1527(d).  The ALJ's decision must set forth "reasons that are sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Hamlin v. Barnhart, 365 F.3d 1208, 1215 (10th Cir. 2004).

In this case, even though Dr. Krenzer's opinion was made three months after her insured status expired, the ALJ erred by failing to consider this relevant evidence and provide

reasons for the weight he gave the opinion.   Defendant's argument that the treating physician's opinion was irrelevant because it post-dated her insured status by three months is again a *post hoc* rationalization that cannot overcome this legal error in the evaluation of the evidence.   Indeed, the ALJ considered other evidence in the record that post-dated the expiration of Plaintiff's insured status, including the report of a consultative psychological evaluation of Plaintiff conducted in January 2003. (TR 32)(noting that "[i]n January 2003, the claimant was examined by Dr. Prewett.  He indicated that the claimant's concentration and attention were adequate during the interview.  At that time, her GAF score was 50.").

In making the step four determination of Plaintiff's RFC for work, the ALJ further compounded the legal error at step three by mischaracterizing Dr. Griscom's opinion contained in a response to supplemental interrogatories posed to the medical expert.  In this document dated November 1, 2005, Dr. Griscom states that if Plaintiff had stopped smoking in March 2002 "[i]t is very possible she could as [sic] improved breathing, more energy, and improved cardiac function could supervene - giving her a sedentary RFC." (TR 314).  The ALJ stated in his decision that "Dr. Griscom indicated that if the claimant had been compliant with her doctor's orders regarding her diet, smoking and drinking, she would have seen moderate improvement and been able to meet the exertional demands of at least sedentary work."  This statement is not supported by the actual document authored by Dr. Griscom which makes no clear finding that Plaintiff would have had the RFC for sedentary work if she had followed her doctor's "orders . . . ."

None of these alleged physicians' "orders" are cited or specifically described by the

ALJ.  It appears that the ALJ's supplemental interrogatories to the medical expert were designed to provide supporting evidence for the finding made by the ALJ in his first decision that "nicotine is an addictive drug within the ambit of the" provisions of the Contract with America Advancement Act of 1996, codified at 42 U.S.C. § 423(d)(2)(c).  (TR 329-332). Under this provision, "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." In reversing and remanding the ALJ's first decision, the Appeals Council stated that it "does not agree that nicotine is a 'drug' for evaluation of drug addiction under the drug and alcohol (DAA) provision of [42 U.S.C. § 423(d)(2)(c)." (TR 354).

The Appeals Council further stated in the remand order that "although the claimant's physicians may have advised her to stop smoking, there is no evidence in the record that such 'treatment' was specifically prescribed.  The Appeals Council concludes that as the claimant did attempt to stop smoking, as advised, and did reduce her overall use of nicotine, failure to follow prescribed treatment is not an issue in this case." (TR 354).

Noncompliance with the advice of a treating physician may be considered in determining a claimant's credibility. See, e.g., Romero v. Astrue, 242 Fed.Appx. 536, 542-543 (10th Cir. July 24, 2007)(unpublished order)(noting that in determining claimant's credibility ALJ did not err by considering evidence that claimant's doctors had advised her to stop smoking in the context of her asthma).  But in this case the ALJ considered Plaintiff's noncompliance, which was mentioned one time in an office note in November 2002 of her

16

treating cardiologist, Dr. Phillips (TR  219), in determining both Plaintiff's credibility and her RFC for work. The ALJ reasoned that Plaintiff had the RFC to perform sedentary work in large part because of Dr. Griscom's opinion, as mischaracterized by the ALJ, that if she had quit smoking she could have performed sedentary work during the relevant time period.

Because the ALJ's opinion contains a multitude of legal errors that cannot be found harmless under the circumstances, the Commissioner's decision should be reversed and remanded for further administrative proceedings.  In light of this finding, it is not necessary to address the remaining claims asserted by Plaintiff.

<u>RECOMMENDATION</u>

In view of the foregoing findings, it is recommended that judgment enter REVERSING  the decision of the Commissioner to deny Plaintiff's applications for benefits and REMANDING the case for further administrative proceedings.  The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before ___ May 1st, 2012, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72.  The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. <u>Moore v. United States</u>, 950 F.2d 656 (10th Cir. 1991); <u>cf.</u> <u>Marshall v. Chater</u>, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed

herein is denied.

ENTERED this _____11th_____ day of _____April_____, 2012.


GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE